**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Theodore B. Schenke,<br><br>    Plaintiff,<br><br>vs.<br><br>Jo Anne B. Barnhart, Commissioner of Social Security,<br><br>    Defendant. | No. CIV 06-027-TUC-JMR (GEE)<br><br>**REPORT AND RECOMMENDATION** |

The plaintiff filed this action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The case has been referred to the United States Magistrate Judge pursuant to the Rules of Practice of this court.

Pending before the court is a motion for summary judgment filed by the plaintiff on May 26, 2006, and a cross-motion for summary judgment filed by the defendant on June 23, 2006. [#12, 14][1]

The Magistrate Judge recommends that the District Court, after its independent review, deny the plaintiff's motion and grant the defendant's cross-motion for summary judgment. The final decision of the Commissioner is supported by substantial evidence.

//

//

---

[1] Clerk's record number.

PROCEDURAL HISTORY

Schenke applied for childhood disability benefits on February 26, 2002. (Tr. 85). He claimed he was disabled from birth due to blindness in his right eye. (Tr. 97).

The Social Security Administration (SSA) denied his application initially and again upon reconsideration. (Tr. 44-47, 51-54). Schenke requested review and, on March 21, 2005, appeared with counsel at a hearing before Administrative Law Judge (ALJ) Lauren Mathon. (Tr. 25-33, 55). The ALJ found Schenke was not disabled. (Tr. 22-24). Schenke appealed the ALJ's decision, but the Appeals Council denied review making the decision of the ALJ the final decision of the Commissioner. (Tr. 5-8); 20 C.F.R. §§ 404.981. He then filed the instant complaint in U.S. District Court appealing the Commissioner's final decision. He filed the instant motion for summary judgment on May 26, 2006. The Commissioner filed the instant cross-motion for summary judgment on June 23, 2006. Schenke filed a combined response and reply on July 10, 2006.

Claimant's Work History and Medical History

Schenke was born in 1983. (Tr. 219). At the time of the hearing, he was nineteen years old. (Tr. 221). He graduated from high school and attended college for one semester. (Tr. 222-223). He completed his last semester of high school through home study due to anxiety. *Id.* He dropped out of college after one semester also due to anxiety. (Tr. 224). He worked briefly for his girlfriend's family business wiring houses for security systems. (Tr. 240-41). Each wiring job lasted one to three days, and he worked on 10 to 15 jobs. *Id.* He worked with one other person while on the job site. *Id.*

The medical record begins in 1993 when Schenke was referred to Sam Sato, M.D. for an opthamological evaluation. (Tr. 162). Sato measured Schenke's uncorrected vision as 17/400 in the right eye and 20/20 in the left eye. *Id.* He diagnosed amblyopia, estropia and anisometropia and recommended surgery. (Tr. 163). Surgery was performed in April of 1993. (Tr. 122). After surgery, Schenke's vision in his right eye improved to 20/200. (Tr. 158).

Schenke began experiencing vision problems in his left eye and was referred to Sato again in May of 1998. (Tr. 157). Sato noted "decreased vision on the left." *Id.* Schenke was referred to Robert Beauchene, M.D., in June of 1999. (Tr. 164). Beauchene diagnosed Schenke with "[i]ncreasing myopia of the left eye, [r]ight amblyopia, and [p]revious exotropia correction." *Id.* Beauchene prescribed glasses for schoolwork and driving at night. *Id.*

In March of 2000, Schenke was examined by William C. McCormick, D.O. (Tr. 165). McCormick noted a history of neck pain and migraine-type headaches for the last two years. *Id.* McCormick concluded Schenke had an "unstable spine" and suggested fusion might be appropriate. *Id.* He warned Shenke "that he should discontinue all physical [sic] strenuous activity including running, jumping or [sic] any kind because of this potential subluxation pinching the cord could be a very serious problem." (Tr. 166). In March of 2000, Schenke was examined by Donald P. Speer, M.D. for evaluation of his spine. (Tr. 167). Speer found posterior listhesis of C3 and C4 of 5 mm. *Id.* In April of 2000, Schenke underwent a CAT scan of the cervical spine which revealed "[m]ild right-sided neural foraminal narrowing of the upper and mid cervical spine." (Tr. 168).

Schenke was given a neurologic examination by Stephen J. Dutch, M.D. in September of 2000. (Tr. 172). Dutch diagnosed musculoskeletal headaches, probably due to his neck instability, as well as childhood migraine, for which he prescribed Midrin and Fioricet. *Id.*

In November of 2001, Schenke had a an anxiety attack and was taken to the emergency room. (Tr. 173).

Between November of 2001 and March of 2002, Schenke was treated by Mark C. Carnett, D.O. and William G. Carnett, D.O. for depression and anxiety disorder. (Tr. 128-130). He was prescribed Nexium, then Xanax (for anxiety) and Paxil and Effexor. *Id.*

In December of 2001, Schenke was evaluated by James P. Reed, D.O. (Tr. 151-53). Reed documented "lifelong problems with anxiety." (Tr. 151). Due to this anxiety, Schenke stopped attending school. *Id.* He then began a home bound program. *Id.* Despite this change, Schenke experienced three panic episodes and was taken to the Emergency Room for the first episode. *Id.* Reed noted Schenke was taking Paxil and Effexor. *Id.* Reed made the following

diagnoses: Axis I Generalized Anxiety Disorder, Dysthymia; Axis II Deferred; Axis III: Functionally blind right eye; Axis IV: Present Psycho-social Stressors: Lack of support system outside of his mother, potential for educational problems; Axis V: Present GAF[2]: 60. (Tr. 152).

In May of 2002, Roland G. Nathan, M.D., reviewed Schenke's medical records and completed a Psychiatric Review Technique Form for the disability determination service. (Tr. 132-145). Nathan documented an affective disorder and an anxiety-related disorder but concluded Schenke's impairments would be non-severe within 12 months due to medication. *Id.*

In May of 2002, Schenke was evaluated by a clinical psychologist, Paige Schaper, Ph.D. (Tr. 184-85). She diagnosed "Axis I: R/O Social Phobia w/Panic Disorder, R/O Major Depressive Disorder, R/O Obsessive Compulsive Disorder, R/O Anxiety Disorder NOS; Axis II: Diagnosis deferred; Axis III: migraines and headaches, allergies, asthma, blind in one eye; Axis V: 50." *Id.* Schenke participated in weekly psychotherapy with Schaper until October of 2002. (Tr. 175-83). At that time, Schaper diagnosed "Axis I: 300.23[3]; GAF: 70." (Tr. 177).

In September of 2002, Paul Tangeman, Ph.D. reviewed Shenke's medical records for the disability determination service and affirmed Nathan's previous evaluation. (Tr. 132).

In May of 2003, Schenke was evaluated by clinical psychologist, Martin R. Levy, Ph.D. (Tr. 203-07). Levy concluded Schenke suffers from severe generalized anxiety disorder. *Id.* He concluded Schenke could not engage in substantial gainful employment. (Tr. 206). Levy completed a mental work tolerance recommendation. (Tr. 201-02). He found Schenke markedly limited in his "ability to work in coordination with or proximity to others without being distracted by them," his "ability to complete a workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without more than the normal rest periods," his "ability to ask simple questions or request assistance",

---

[2] Global Assessment of Functioning. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (hereinafter, DSM-IV), 1994 American Psychiatric Association, pp. 30-32.

[3] Social Anxiety Disorder. DSM-IV, p. 411.

- 4 -

1  his "ability to accept instructions and respond appropriately to criticism from supervisors," and
2  the "ability to travel in unfamiliar places or to use public transportation." *Id.* Levy opined that
3  Schenke was unable to work in a normal workplace setting though "might be able to work in
4  a cubicle with a computer alone in a room with other people." (Tr. 202) (emphasis in original).

5  On May 13, 2003, Schenke appeared at a hearing before Administrative Law Judge
6  (ALJ) Lauren R. Mathon. (Tr. 217). He testified he is legally blind in one eye. (Tr. 224). His
7  remaining good eye fatigues easily. (Tr. 225). He has headaches three to five times a week and
8  migraines once a month. (Tr. 225-26). He has neck pain which limits his ability to hold his
9  head in one position. (Tr. 227-29).

10  He also suffers from anxiety which limits his ability to be in public places. (Tr. 229-31).
11  Because of his anxiety, he was home schooled for his last semester of high school. (Tr. 222).
12  He then attended college for one semester, but dropped out due to his anxiety. (Tr. 224).
13  Schenke spends 18 hours of the day in his room at home. *Id.* He spends "six or seven" hours
14  each day on the computer. *Id.*

15  Stacy Schondrun, a vocational expert witness, testified at the hearing that a person blind
16  in one eye who could follow detailed, but not complex instructions, and could tolerate only
17  limited contact with supervisor, co-workers, and no public contact could work as a data entry
18  clerk, file clerk, night security guard or janitor. (Tr. 257-58).

19
20  CLAIM EVALUATION

21  Social Security Administration (SSA) regulations require that disability claims be
22  evaluated pursuant to a five-step sequential process. 20 C.F.R. § 404.1520; *Baxter v. Sullivan,*
23  923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of whether the
24  claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4). If so, then the
25  claimant is not disabled and benefits are denied. *Id.* However, if the claimant is not engaged
26  in substantial gainful activity, the ALJ proceeds to step two, which requires a determination of
27  whether the claimant has a "medically severe impairment or combination of impairments." 20
28  C.F.R. § 404.1520(a)(4).

In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limits or restricts his or her "physical or mental ability to do basic work activities." *Id*. If the ALJ concludes the impairment is not severe, the claim is denied. *Id*. Upon a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4); 20 C.F.R. Pt. 404, Subpart P, App.1. If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled, and no further inquiry is necessary. *Ramirez v Shalala,* 8 F.3d 1449, 1452 (9th Cir. 1993). If the claimant's impairment does not, evaluation proceeds to the next step.

The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity[4] (RFC) to perform past work. 20 C.F.R. § 404.1520(a)(4). If the ALJ concludes the claimant has sufficient RFC, then the claim is denied. *Id*. If the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience. 20 C.F.R. § 404.1520(a)(4).

In determining whether the claimant retains the ability to perform other work, the ALJ may refer to the Medical Vocational Guidelines ("the grids") promulgated by the SSA. *Desrosiers v. Sec'y of Health and Human Services,* 846 F.2d 573, 576-77 (9th Cir. 1988). The grids categorize jobs according to their exertional requirements such as sedentary work, light work, or medium work. *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). Based on the claimant's exertional ability, age, education, and work experience, the grids determine whether or not the claimant is disabled. *Id.* The grids are a valid basis for denying claims "where they

---

[4] Residual functional capacity is defined as that which an individual can still do despite his or her limitations. 20 C.F.R. § 404.1545.

- 6 -

completely and accurately describe the claimant's limitations" and abilities. *Id.* at 1101. If the claimant has significant non-exertional limitations, the grids do not apply. *Penny v. Sullivan,* 2 F.3d 953, 958-59 (9th Cir.1993). "Non-exertional limitations are limitations that do not directly affect a claimant's strength." *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988). Mental limitations, for example, are non-exertional. *Id.* at 1340-41. If significant non-exertional limitations prevent the claimant from performing the full range of work in any exertional category, the ALJ must take the testimony of a vocational expert to deny the claim. *Id.* at 1341.

### The ALJ's Findings

At step one of the disability analysis, the ALJ found Schenke had not engaged in any substantial gainful activity since his alleged onset date. (Tr. 32). At step two, she found Schenke had severe impairments: right eye blindness, generalized anxiety disorder, and dysthymia. *Id.* At step three, the ALJ found Schenke's impairments did not meet or equal the criteria for any impairment found in the Listing of Impairments, Appendix 1, Subpart P, of 20 C.F.R., Part 404. *Id.* The ALJ then analyzed Schenke's residual functional capacity. *Id.* She made the following finding:

> He has a history of some neck pain but with no severe exertional limitations, he is subject to right eye blindness, and his psychological status is marked by the ability to understand/follow complex instructions, a need for limited contact with supervisors and co-workers, and no public contact.

(Tr. 32). At step four, the ALJ concluded Schenke had no past relevant work. *Id.* At step five, the ALJ concluded, based on the testimony of a vocational expert, that Schenke could work as a data entry worker, file clerk, night security guard, and night office or commercial janitor/cleaner. *Id.*

### STANDARD OF REVIEW

1  To qualify for disability benefits, an individual must demonstrate, through medically acceptable clinical or laboratory standards, "an inability to engage in any substantial gainful activity" due to a "physical or mental impairment" that "can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). "A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy." *Penny v. Sullivan,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984) (*citing Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984). Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. § 405(g). The court may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted). "The [Commissioner's] determination that a claimant is not disabled will be upheld if the [Commissioner] applied the proper legal standards and if there is substantial evidence in the record as a whole to support the decision." *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1987). The standard is less than a "preponderance of the evidence" standard. *Matney,* 981 F.2d at 1019.

"[I]f the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney,* 981 F.2d at 1019 (citing *Richardson,* 402 U.S. at 400). When applying the substantial evidence standard, however, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v.*

*Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).  Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's conclusion.  *Id*.  A denial of benefits will be set aside if the Commissioner fails to apply proper legal standards in weighing the evidence even though the findings may be supported by substantial evidence.  *Frost v. Barnhart*, 314 F.3d 359, 367 (9th Cir. 2002);  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

In evaluating evidence to determine whether a claimant is disabled, the opinion of a treating physician is entitled to great weight.  *Ramirez,* 8 F.3d at 1453-54.  The Commissioner may reject a treating physician's uncontradicted opinion only if she sets forth clear and convincing reasons for doing so.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (*citing Baxter*, 923 F.2d at 1396);  *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989).  If the treating physician's opinion is contradicted by another doctor, the Commissioner may reject that opinion only if she "provid[es] specific and legitimate reasons supported by substantial evidence in the record."  *Lester,* 81 F.3d at 830.  No distinction is drawn "between a medical opinion as to a physical condition and a medical opinion on the ultimate issue of disability."  *Rodriguez v. Bowen*, 876 F.2d 759, 762 n.7 (9th Cir. 1989).

"The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non[-]examining physician."  *Lester*, 81 F.3d at 830.  "[T]he Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician."  *Id.*  "[T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  *Id.* at 830-31.

When medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner.  *Magallanes,* 881 F.2d at 751 (citations omitted).  The Commissioner's finding that a claimant is less than credible, however, must have some support in the record.  *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997).

1  The ALJ need not accept the claimant's subjective testimony of disability, but if she decides to reject it, "[she] must provide specific, cogent reasons for the disbelief." *Lester,* 81 F.3d at 834. "Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*

DISCUSSION

The decision of the ALJ is supported by substantial evidence. She properly relied on the testimony of the vocational expert in determining that Schenke has the ability to perform a significant number of jobs in the national economy. *See Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) ("The [Commissioner] can meet [her] burden by propounding to a vocational expert a hypothetical that reflects all the claimant's limitations.").

Schenke argues the opinion of the vocational expert does not constitute substantial evidence because the ALJ's hypothetical failed to account for the limitations imposed by his neck pain. To be valid, the ALJ's hypothetical must set out all the limitations and restrictions of the claimant. *Magallanes*, 881 F.2d at 756-57. The ALJ, however, need not include all of the claimant's alleged limitations. She need only include those restrictions that are supported by substantial evidence. *Roberts*, 66 F.3d at 184.

Here, the ALJ recognized Schenke experienced some neck pain but concluded this pain was not severe enough to limit his ability to work. (Tr. 30). Schenke testified that his neck pain limited his ability to look in one direction for long periods of time. (Tr. 245). He was examined by a number of physicians for his neck pain in the Spring of 2000 but apparently no action has been taken since then. (Tr. 165, 167, 168). Shenke admitted he played racquetball two times per week during the Summer of 2002. (Tr. 246). In addition, he performs household chores such as dusting and lifting heavy bags of garbage. (Tr. 247-48). He treats his neck pain with over-the-counter analgesics, not prescription medication. (Tr. 244-45). Substantial evidence supports the ALJ's conclusion that Schenke's neck pain does not limit his ability to work. *See,*

- 10 -

*e.g., Osenbrock v. Apfel*, 240 F.3d 1157, 1166 (9th Cir. 2001) (Claimant's allegation of disabling pain rejected in part because he was not taking strong prescription analgesics.); *Flaten v. Sec'y of Health & Human Services*, 44 F.3d 1453,1464 (9th Cir. 1995) ("[T]he ALJ was entitled to draw an inference from the general lack of medical care for back problems during the intervening years . . . .").

Schenke further argues the ALJ improperly adopted her own interpretation of Schenke's vocational limitations and rejected the set of limitations proposed by his physicians. The ALJ, however, is responsible for resolving conflicts and ambiguities in the record. She need not believe everything a physician sets forth. She may accept all, some, or none of the physician's opinions provided her conclusions are supported by the record. *Magallanes*, 881 F.2d at 753-54; *See also Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988) ("It is not necessary to agree with everything an expert witness says in order to hold that his testimony contains 'substantial evidence.'"). Here, Schenke's examining physician, Levy, and the non-examining disability determination physicians disagreed on the extent of Schenke's vocational limitations. The ALJ considered the medical and non-medical record and reached her own conclusion as to Schenke's vocational limitations. This is not error.

Schenke further argues the ALJ failed to properly consider the vocational expert's opinion that he was "unemployable." The court does not agree. The expert was addressing an issue that is irrelevant to the disability determination.

At the hearing, Schenke's counsel questioned the vocational expert as follows:

Q  If you were to take into consideration the testimony of Mr. Schenke here today, your observation of him at the time of the hearing and his response to answers. And also the information contained – well, take that into consideration first off. Would that affect or change any of the information which you provided to the Judge regarding the suitability of those four jobs you outlined?

A  Yes, it would.

Q  And how would it be changed?

A  I think, based on his presentation and his, and his testimony, I think he's most probably unemployable.

Q  Why specifically?

> A  Specifically the inability to make eye contact. His obvious discomfort in being in the room and talking to the Judge. His poor speech patterns. A very flat affect, none of which I think would be terribly attractive to an employer.

(Tr. 261-62). The vocational expert opined that Schenke's appearance and demeanor would not be "terribly attractive to an employer." *Id.* Accordingly, she opined he is "most probably unemployable." *Id.*

Disability, however, turns only on the ability of a person to do work, not on the ability of the person to be hired. The statute clearly states "an individual . . .shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he . . . cannot . . . engage in any . . . kind of substantial gainful work which exists in the national economy, *regardless of whether . . . he would be hired if he applied for work.*" 42 U.S.C. § 423(d)(2) (emphasis added). The fact that Schenke might not be "terribly attractive to an employer" is irrelevant. *See, e. g., Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1986) (It was irrelevant to the disability analysis that employers "were reluctant to hire people with physical handicaps" and "discriminated against older applicants."). The ALJ did not err by failing to consider the vocational expert's testimony that Schenke was "most probably unemployable."

Schenke further argues the ALJ failed to properly consider the opinion of his psychologist, Martin R. Levy, Ph.D. (Tr. 203-07). Levy concluded Schenke suffers from severe generalized anxiety disorder. (Tr. 206). He found Schenke was markedly limited in his "ability to work in coordination with or proximity to others without being distracted by them," his "ability to complete a workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without more than the normal rest periods," his "ability to ask simple questions or request assistance," his "ability to accept instructions and respond appropriately to criticism from supervisors," and his "ability to travel in unfamiliar places or to use public transportation." (Tr. 201-202). He concluded Schenke's mental impairments probably rendered him disabled although he might be able to tolerate a workplace where his contact with other people was significantly limited. *Id.* at 202.

Schenke argues Levy could be characterized as a "treating physician" rather than an "examining physician" because Schenke testified that he saw Levy on two different occasions. The court will assume, without deciding, that Levy is a treating physician.

Levy's conclusions are inconsistent with the findings of non-examining disability determination physicians[5], Nathan and Tangeman, who found Schenke was not disabled. Accordingly, the ALJ could discount Levy's opinion of disability only by providing "specific and legitimate reasons that are supported by substantial evidence in the record." *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir.1996). In this case, the ALJ has provided such reasons.

The ALJ discounted Levy's evaluation of Schenke's mental impairments for the following reasons: (1) Drs. Reed and Schaper documented stabilization or improvement in Schenke's condition with treatment, (2) Schenke received no psychological treatment between November 2002, when he concluded treatment with Schaper, and April of 2003 when he was evaluated by Levy, (3) Levy's evaluation fails to account for Schenke's ability to work part-time and travel by air to Michigan, and (4) Levy's evaluation was internally inconsistent. (Tr. 30-31). The court concludes reasons (1)-(3) constitute specific and legitimate reasons for discounting Levy's opinion on disability. The court does not consider rationale (4).

Reed evaluated Schenke in December of 2001 shortly after he was hospitalized for a panic attack. (Tr. 151). The record includes treatment notes from January to August of 2002. (Tr. 147-150). At first, Schenke reported continued mental problems with anxiety while Reed continued to adjust his medication. *Id.* By June, Schenke reported feeling better with less anxiety and no panic attacks. *Id.* At this time, Schenke began treatment with Schaper. (Tr. 175-85). The record contains treatment notes from May of 2002 until October of 2002. *Id.* Schaper also documented improvement in Schenke's mental impairment. *Id.* In May, she rated his Global Assessment of Functioning (GAF) at 50. (Tr. 185). This rating reflects "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV,

---

[5] The term "physician" includes psychologists and other health professionals who are not medical doctors. *Lester v. Chater*, 81 F.3d 821, 830 n.7 (9th Cir.1995).

- 13 -

pp. 30-32. By October, his depression and anxiety appeared to be under control, and Schaper rated his GAF at 70. (Tr. 177). This rating reflects "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV, pp. 30-32. Schaper did not make any specific findings as to Schenke's vocational limitations or his ability to work. Nevertheless, her general evaluation of Schenke's condition appears to be in conflict with Levy's opinion of disability.

The ALJ noted that Schenke received no psychological treatment between November of 2002 and his evaluation by Levy in April of 2003. (Tr. 30). An unexplained gap in treatment may be interpreted as evidence that the claimant's condition is less serious than the claimant alleges. *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)

Also, the ALJ noted that Levy failed to discuss Schenke's ability to work part-time or his ability to travel by air to Michigan. (Tr. 30). The ALJ did not consider Schenke's part-time work to constitute substantial gainful activity. Nevertheless, his part-time work is some evidence that Schenke could work with others, take instruction, and perform work-related tasks. Similarly, Schenke's ability to travel by air is some evidence that he could work in close proximity to others and "travel in unfamiliar places or to use public transportation." Levy's failure to consider Schenke's part-time work and his ability to travel by air is evidence that Schenke is not as impaired as Levy concludes.

The ALJ provided specific and legitimate reasons supported by substantial evidence to discount Levy's evaluation of Schenke's mental impairment. The ALJ did not err when she discounted Levy's estimation of Schenke's work-related limitations.

Finally, Schenke argues the ALJ erred by failing to develop the record. Specifically, he argues the ALJ should have required that Schenke's physicians provide a medical source statement concerning the functional limitations of his neck pain.

Because the social security process is inquisitorial not adversarial, the ALJ has an independent duty to develop and complete the record sufficiently to ensure an accurate evaluation. *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). This duty, however, is triggered "only

- 14 -

1  when there is ambiguous evidence or when the record is inadequate to allow for proper
2  evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).  Here,
3  there is sufficient evidence to evaluate Schenke's medical condition and render a proper
4  judgment.  The fact that Schenke's physicians did not complete a medical source statement
5  concerning his neck pain does not, by itself, make the medical records incomplete.  *See* 20
6  C.F.R. § 404.1513 (b)(6).

7  Shenke further argues the ALJ should have ordered a consultative examination pursuant
8  to 20 C.F.R. § 404.1519a.  A consultative examination, however, is required only "when the
9  evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on
10 [the] claim."  20 C.F.R. § 404.1519a(b).  Here, there is sufficient evidence to support the
11 decision of the ALJ.  The failure of the ALJ to order a consultative examination was not error.

### RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review, deny the plaintiff's motion and grant the defendant's cross-motion for summary judgment.  [#12, 14]

Pursuant to 28 U.S.C. § 636(b), any party may file and serve written objections within 10 days after being served with a copy of this Report and Recommendation.  If objections are not timely filed, the party's right to de novo review may be waived.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc), *cert. denied*, 540 U.S. 900 (2003).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 16th day of October, 2006.

_____
Glenda E. Edmonds
United States Magistrate Judge